UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

TOY GUY and DENISE CURTIS,

                              Plaintiffs,

                  -against-

CONSOLIDATED EDISON OF NEW YORK, INC.,
DANNY SILVA, TOM FOX and GARY LEVY,

                            Defendants.

-----------------------------------------------------------------------X

**15 Civ. 9044**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Toy Guy and Denise Curtis, individually and on behalf of all others similarly situated (collectively, Plaintiffs), by their attorneys, Advocates for Justice, Chartered Attorneys, for their complaint against Defendants Consolidated Edison of New York Inc. ("ConEd"), Danny Silva ("Defendant Silva"), Tom Fox ("Defendant Fox") and Gary Levy ("Defendant Levy") allege as follows:

## PRELIMINARY STATEMENT

1.       This is an employment discrimination action for injunctive, monetary, and other relief brought by two women who were employed by ConEd, to remedy a decade of discrimination directed at female employees, including Plaintiffs, who were treated unfairly because they are women and because of their respective race, color, and ethnicity and because they reported discriminatory treatment by their respective supervisors and co-workers to ConEd's Human Resources and Ethics Department and to its Ombudsman.

## JURISDICTION AND VENUE

2.       The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332; and 42 U.S.C. § 2000(e). This Court's pendent jurisdiction is also invoked for claims brought under New York State and New York City law pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because at least one the defendants does business in this District, and because some of the causes of action arose and the acts and omissions complained of occurred in this District.

## PARTIES

4.      Plaintiff Toy Guy is a resident of Kings County, New York and continues to work as an employee of ConEd.

5.      Plaintiff Denise Curtis, formerly Denise Frias prior to marriage, is a former ConEd employee and is a resident Nassau County, New York.  She no longer works for ConEd.

6.      Defendant ConEd is a regulated utility company with its principal offices located at 4 Irving Place, New York, New York 10003. ConEd is an "employer" within the meaning of 42 U.S.C. § 2000(e), the New York State Human Rights Law § 292, and the New York City Human Rights Law § 102.

7.      Defendant Silva is a former employee of Defendant ConEd and is upon information and belief, a resident of New York, New York.

8.      Defendant Fox is upon information and belief an employee of ConEd and is upon information and belief, a resident of Kings County, New York.

9.      Defendant Levy is upon information and belief an employee of ConEd and is upon information and belief, a resident of Kings County, New York.

## PROCEDURAL HISTORY

10.      On February 12, 2009, Toy Guy and Denise Curtis filed their initial charge with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination against their employer, ConEd. On November 24, 2009, Ms. Guy filed an amended charge with the EEOC.

2

11.     Both Ms. Guy's and Ms. Curtis's EEOC charges claim discrimination on the basis of gender, including quid pro quo sexual harassment, hostile work environment, gender discrimination, and retaliation for complaining about discriminatory treatment. Plaintiffs also claim discrimination on the basis of race, color, and ethnicity.

12.     On November 7, 2011, following extensive investigation of Defendant ConEd and its offices, the EEOC found probable cause in favor of the charging parties, including Ms. Guy and Ms. Curtis.[1]

13.     The EEOC found, among other things, that: (a) the charging parties (including Ms. Guy and Ms. Curtis) and a class of current and former female employees employed in the field had been discriminated against on account of their sex; (b) their claims of hostile work environment and being treated less favorably than male employees with respect to promotion had been corroborated; (c) they have been subject to discriminatory training opportunities and other terms, conditions, or privileges of employment, including but not limited to, unequal bathroom facilities; (d) they had been subject to sexual harassment; and (e) they were retaliated against for complaining about the above.

14.     On August 19, 2015, the EEOC issued Ms. Guy and Ms. Curtis their respective Right to Sue Letters.[2]

**<u>SUMMARY OF FACTS: TOY GUY</u>**

15.     Not to minimize or take anything away from the other charging parties' experiences, as they were each individually treated reprehensibly, Ms. Guy's experiences pale in

---

[1] *See* Exhibit 1. Plaintiffs' claims of race, color, and ethnicity discrimination are not the subject of the EEOC's probable cause finding as they did not investigate the charging parties' claims on these bases.
[2] See Exhibit 2.

comparison to most of the other experiences of her fellow charging parties. The following is a brief account of her experiences and is not intended to be exhaustive.

16.     Ms. Guy is a 41-year old  African American woman who began working at ConEd  in September 2006 in the entry level position of General Utility Worker ("GUW"). She worked in electrical construction, at the various substations and gen stations throughout New York City, primarily in Manhattan. Her work was very physical and it was, unquestionably, non-traditional work for a woman.

17.     The discriminatory treatment against Ms. Guy began immediately upon her taking the job.  Ms. Guy had the misfortune of being assigned immediately to a supervisor named Danny Silva (Defendant Silva), who took an immediate sexual interest in her and began on ongoing course of harassing and discriminatory conduct that persisted the entire time Ms. Guy worked with Defendant Silva.  In addition to Defendant Silva's own grossly inappropriate conduct, he set the tone for how Ms. Guy was treated by the other supervisors and her male coworkers. Not only were most of the supervisors at ConEd male, but many of them were long-term friends who supported each other on the job and socialized regularly over drinks. That meant that if an employee ran afoul of one of them, she ran afoul of all of them.

18.     The first day Ms. Guy arrived at work, Defendant Silva asked her if she was married. When she said she was not married but said she had a boyfriend, he followed up by asking if she dated others. He also volunteered that he dated outside his marriage. Ms. Guy told him clearly that she was not interested.

19.     Defendant Silva did not back off. He began assigning Ms. Guy much-needed overtime and then telling her that she needed to take him to dinner to thank him. When she did not accept his suggestion, he propositioned her, saying he'd like her to be his girlfriend on the

side. Defendant Silva made it clear that Ms. Guy's career and success would be negatively

impacted if she refused.  He stated that if she took care of him, he would take care of her. He also

threatened to fire her if she did not take care of him.

20.     Once it became clear that his efforts were not going to produce results, Defendant

Silva took the classic approach of scrutinizing Ms. Guy's work and looking for excuses to write

her up. Ms. Guy complained to the shop steward, who observed that Defendant Silva seemed to

be interested in Ms. Guy but did nothing to assist her. In fact, he told one of the other male co-

workers about their conversation. Thus, it became common knowledge that Defendant Silva

wanted a sexual relationship with Ms. Guy and had it in for her because she had refused him.

21.     Defendant Silva began to punish Ms. Guy. He did this primarily by attacking her

pocketbook. Knowing that she was only earning about $30,000 a year and needed overtime to

support herself and her son, he found various ways to deny her overtime. He also denied her

holiday assignments where she would have earned at least time-and-a-half.

22.      Defendant Silva also created a hostile work environment, using ugly slang words

to refer to women: bitch, slut, and whore, for example. Ms. Guy politely requested that he stop

using that language, but he ignored her.

23.     To put this hostile treatment in perspective, Ms. Guy was often the only female

GUW (the lowest entry-level position) at a substation. Her male coworkers followed Defendant

Silva's lead. Despite Ms. Guy making clear to Defendant Silva that she was not interested in him,

he often embarrassed her by treating her differently than the other employees in front of her male

coworkers because she is a woman.  He behaved as though she was his girlfriend in front of the

other men at the station. For example, he said in front of the other men that he'd like to take her

to Puerto Rico with him but she cost too much.  He referred to her as a gold digger. He teased

her about the size of her butt. The other men followed suit, and began to tease her about her butt, as well. The men also made sexual comments about Ms. Guy's walk. In addition to harassing Ms. Guy in front of her coworkers, Defendant Silva continued this behavior in front of contractors. Specifically, he also told one of the contractors that he was sexually involved with Ms. Guy.

24.    Defendant Silva also held Ms. Guy back from achieving a promotion to the next level position, called Mechanic B, where she would have earned more money. The promotion required both a written test and a practical component. She had passed the written test, but Defendant Silva claimed that she owed him a steak dinner and was holding off scheduling the practical part until she complied. Ms. Guy complained to the shop steward, who sent her on a wild goose chase, which ultimately resulted in Ms. Guy learning that Defendant Silva had only to send an email authorizing the practical test. Defendant Silva repeatedly told Ms. Guy that her test was not his priority.  However, he meanwhile scheduled a male Mechanic B to take the Mechanic A test, while denying Ms. Guy the her opportunity for advancement.

25.    Defendant Silva's behavior became increasingly hostile the longer Ms. Toy worked for him.  One day, after Ms. Guy returned to work from having attended a required meeting for women with the ombudsman, Defendant Silva demanded to know what happened at the meeting and why she hadn't taken a ride back with his friend, Iris. When she declined to answer, he got very close to her face and demanded to know why she hadn't checked in with him after her return. She calmly explained she had checked in with another supervisor, but that did not appease him. After a few more explanations, Ms. Guy walked away, but Defendant Silva pursued her. She told him that he was trying to intimidate her and he didn't treat men that way. Eventually, there was yelling and the shop steward came in. Defendant Silva retaliated by sending Ms. Guy to a substation where there was little to no overtime.

26.     Ms. Guy reported this incident and various others to the ombudsman, who told Ms. Guy that she had to take her complaint to ConEd's Equal Employment Office (EEO).

A.     **Incompetence of the Company's EEO**

27.     Ms. Guy met with Gretchen King at EEO. That visit did seem to result in Ms. Guy finally getting to take and pass the Mechanic B test, but the delay caused her to miss out on an additional $2.48 an hour for four months, as well as the differential for overtime.

28.     Thereafter ensued a lengthy EEO process that purported to be an investigation of Ms. Guy's claims by Ms. King.   Suffice it to say, the so-called investigation displayed some combination of incompetence and indifference and did not appear intended to reveal the facts or remedy the harassment and discrimination targeted at Ms. Guy.

B.     **Retaliatory Harassment Continued**

29.     Shortly after Ms. Guy complained to EEO, Defendant Silva, who had repeatedly threatened to cut the lock on Ms. Guy's locker, leaving her possessions vulnerable to theft, made good on his threat. This cannot be disputed, as the security camera captured him entering the facility with a wire cutter. Ms. Guy lost $300 that she had been saving in that secure place.

30.     After that, Ms. Guy was so upset that she took a stress leave. She was out sick for about three weeks of unpaid time.

31.     After she returned, EEO informed Ms. Guy that they had found that Defendant Silva had sexually harassed her and retaliated against her. Unfortunately, however, the punishment was only a one-week suspension for Defendant Silva.

32.     Defendant Silva was a supervisor and therefore had no union protection; he could easily have been terminated. Ms. Guy became very upset and explained that there was no way to

escape Defendant Silva or his friends. By keeping him employed at ConEd, they had doomed her to permanent retaliation.

33.     As a result of Defendant Silva's treatment, EEO's failure to properly discipline or terminate him, and ConEd's indifference, Ms. Guy began developing migraine headaches and had to take time off from work. She also lost weight and her hair began to fall out. Ms. Guy took another stress leave for another three weeks or so.

34.     Defendant Silva's harassing and discriminatory conduct did not stop.  He personally demonstrated the inefficacy of the one-week suspension punishment when he attempted for a second time to gain access to the locker room to cut Ms. Guy's lock, this time with the assistance of a shop steward. Thankfully, another supervisor learned about the plan and stopped them before they succeeded. The stress of feeling so vulnerable, however, continued.

35.     ConEd eventually terminated Defendant Silva but not until well after the EEOC charges were filed.  The retaliation against Ms. Guy continued in various forms, even after Defendant Silva was terminated.

36.     For example, Ms. Guy continued to be deprived of overtime. The overtime issue took several forms. At the time Defendant Silva was still employed at ConEd, the shop steward would tell Ms. Guy that the only available overtime involved working with Defendant Silva. Ms. Guy complained to EEO, which resulted in only one occasion where Defendant Silva was taken off the overtime and Ms. Guy was placed on it. After Defendant Silva was gone, the issue became that much of the overtime is done at stations where Defendant Silva's long-term buddies were the supervisors. Ms. Guy was, and remains, simply too fearful and stressed by the comments and looks to accept those assignments. The ongoing deprivation of overtime continues to this day.

37.     This fear also caused a delay in Ms. Guy's promotion.  She delayed taking her Mechanic A test, fearing that she would lose seniority and be sent to sites that were too far from her home as a further form of retaliation. (During much of this time, Ms. Guy was the sole caretaker of her son.)

38.     Defendant Silva also retaliated against Ms. Guy by marking her "AWOL" when she was not. Ms. Guy had requested emergency leave and the supervisor (a friend of Defendant Silva) knew she was out caring for her son on an emergency basis. The marking of Ms. Guy as AWOL led to a series of events that resulted in her losing out on two raises. The lost raises have permanently reduced her income.

39.     Another supervisor (who attended high school with Defendant Silva) instructed Ms. Guy to lift a pipe threader that weighed more than she does while a much larger male mechanic was present.

40.     Defendant Silva also deliberately floated negative rumors about Ms. Guy, and reported her to Human Resources.

41.     Ms. Guy has suffered this retaliation even though, as noted above, the EEOC has found probable cause on Ms. Guy's claims of sexual harassment, hostile work environment, and retaliation.

## SUMMARY OF FACTS: DENISE CURTIS

42.     Ms. Curtis is a 40-year-old Hispanic woman. She began working for ConEd as a GUW in February 2005, at which time she was the only female GUW in her yard. ConEd fired her in January 2008 for a pretextual reason. During her three years at ConEd, Ms. Curtis experienced constant harassment from her supervisor and coworkers in retaliation for her

complaints about discrimination on the job. Her coworkers blocked her access to training and impeded her ability to advance in her department.

**A.    Blocked Access to Training and Promotions.**

43.    In the Underground Field Operating Department where Ms. Curtis worked, most GUWs are promoted to Assistant Field Operator within six months. The wage rates for Assistant Field Operators are approximately 25% higher than the wage rates for GUWs. Because her coworkers and supervisors impeded her training, Ms. Curtis was not promoted for nearly two years.

44.    One way Ms. Curtis's coworkers prevented her access to training was they prevented her from going into the manholes. Underground utility workers work in manholes on underground electrical lines. To advance, GUWs must learn the different operations in underground structures. Her partner told her that other men did not want to work with her, which her male coworkers confirmed by their actions.

45.    Ms. Curtis' coworkers made stereotypically sexist and degrading remarks such as: (a) she should be working in an office; (b) she should not be working the night shift; and (c) that she should not be working underground. One coworker said that if he were her father he would not allow her to do the kind of work she did. Others told her that they didn't want to work with her because she would not be able to lift manhole covers (which she was trained to do and did do). On several occasions they protested having to work with her on the grounds that she might have to go to the bathroom, a complaint they never raised about men.

**B.    Mistreatment and Retaliation by Supervisors.**

46.    Defendant Fox, the supervisor in charge of scheduling for Ms. Curtis's department, singled her out for unfair discipline. A few months after she started working for

ConEd, Ms. Curtis missed a day of work due to a family emergency. She notified her field supervisor of the expected absence before her shift. However, when she returned to work, Defendant Fox began screaming at her for not reporting for her shift. No one had instructed her to speak to Defendant Fox. Ms. Curtis had never witnessed Defendant Fox screaming at male employees in the same way. Around the same time, Defendant Fox did not reprimand a male employee who missed a day of work for family reasons.

47.     Further, her supervisor singled her out for more discriminatory treatment, including by telling her what she could and could not wear to work. Ms. Curtis never heard her supervisor instruct male employees what they could and could not where to work.

48.     After Ms. Curtis filed a union grievance about Defendant Fox's behavior, he began retaliating against her. He did not appear at a union-arranged "sit down" to discuss her complaint.

49.     After Ms. Curtis started to complain about Defendant Fox, he belatedly decided to "write her up" for the day she had previously missed, and added a complaint about a previous scheduling incident that resulting from a misunderstanding that had happened several months earlier. Another male coworker who had experienced the same misunderstanding was not written up.

50.     Ms. Curtis believed these write-ups to be unfair and discriminatory.  They were detrimental to her career because under the progressive discipline system were a step toward termination.

51.     Ms. Curtis complained about Defendant Fox's actions to Defendant Levy, the head of her department, who was a friend of Defendant Fox.  Defendant Levy did nothing about the write-ups.

52.    Instead, Defendant Levy joined in Defendant Fox's retaliation, discrimination and harassment.  A coworker subsequently informed Ms. Curtis that Defendant Levy asked him to write up a false complaint about Ms. Curtis talking on her cell phone, which the coworker had refused to do.

**C.     Harassment by Coworkers.**

53.    Shortly after Ms. Curtis complained to Defendant Levy about Defendant Fox's behavior, someone in her department posted an article about drivers talking on cell phones that contained the line "women and young people are the most common yackers." Someone had marked up that line to read, "women and young people blow us."

54.    Ms. Curtis complained to ConEd's EEO office about this incident and about the retaliation she was experiencing. She provided a copy of the article. The EEO office never interviewed her or followed up. When she inquired further, the EEO office told her that they had investigated and determined that her complaints were "not founded."

**D.     Disability Program and Retaliatory Failure to Accommodate.**

55.    Ms. Curtis took a disability-related leave of absence in 2006, at the end of which she was diagnosed with muscular dystrophy. A ConEd physician determined that she should be removed from the field, and told her to report to her old yard on her normal shift to get a new work assignment. Ms. Curtis did so, and was assigned to ConEd's Public Affairs office.

56.    A few days later, Defendant Fox and human resources representative Nancy Forte met with her, and Defendant Fox reprimanded her and suspended her for one day for reporting to the yard at the wrong time, even though she had done as she was told to do.

57.    Beginning in January 2009, Ms. Curtis was allowed to continue temporarily in the Public Affairs office as part of ConEd's "C6" program, which allows field workers on light duty

to transition into office jobs after passing a series of clerical and administrative tests. Ms. Curtis'

supervisors were very happy with her work, and gave her outstanding performance reviews and

positive feedback, calling her "dependable, resourceful, and smart." She trained several other

employees who came through the department. Her supervisors told her that they were

understaffed, and that they would like her to continue in the position.

58.    To remain in the Public Affairs department, Ms. Curtis had to pass the C6 tests.

She passed all but the typing test, for which she requested a physical accommodation due to her

disability. Nancy Forte, the same human resources representative who had allowed Defendant

Fox to write her up unfairly, denied the request, saying that ConEd only allowed

accommodations to people within their title. Because she was a GUW, they could not make an

accommodation for a typing test.

59.    A union representative later told her that this was not true, and that a Caucasian

male field worker who had lost his eyesight had been allowed to transition into a permanent

office job without passing all of the C6 tests. This was not the only incident where a Caucasian

male field worker who had a disability was allowed to transition into a permanent position

without passing all of the C6 tests.

60.    The head of the Public Affairs department, Yuille Williams, told Tom Newell, the

head of electric operations, that they wanted Ms. Curtis to continue with their department, and

requested his approval. Mr. Newell refused.

61.    In January 2008, ConEd fired Ms. Curtis.

### AND AS FOR A FIRST CAUSE OF ACTION

62.    Defendants, individually and aiding each other, violated Plaintiffs' rights under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et seq.* by discriminating against them

on the basis of their gender, race, color, and ethnicity. Plaintiffs were singled out and treated differently from their other male employees, co-workers, and colleagues (who were mostly Caucasian) in the department where they were sexually harassed and humiliated, lost promotion opportunities, lost potential raises and opportunities to receive raises, were retaliated against, issued unrealistic and unattainable deliverables, received sham "write ups" and other criticisms and mistreatment, and in the case of Ms. Curtis, lost employment.

63.     Defendants, individually and aiding each other, violated Plaintiffs' rights under 42 U.S.C. § 1981 by discriminating against them on the basis of their respective races. Plaintiffs were singled out and treated differently from their other male Caucasian employees, co-workers, and colleagues in the department where they sexually harassed and humiliated, lost promotion opportunities, lost potential raises and opportunities to receive raises, were retaliated against, issued unrealistic and unattainable deliverables, received sham "write ups" and other criticisms and mistreatment, and in the case of Ms. Curtis, lost employment.

## AND AS FOR A SECOND CAUSE OF ACTION

64.     Defendants, individually and aiding each other, violated Plaintiffs' rights under § 296 of the New York State Human Rights Law by discriminating against them on the basis of their gender, color, and race. Plaintiffs were singled out and treated differently from their other male and Caucasian employees, co-workers, and colleagues in the department where they sexually harassed and humiliated, lost promotion opportunities, lost potential raises and opportunities to receive raises, were retaliated against, issued unrealistic and unattainable deliverables, received sham "write ups" and other criticisms and mistreatment, and in the case of Ms. Curtis, lost employment.

## AND AS FOR A THIRD CAUSE OF ACTION

65.     Defendants, individually and aiding each other, violated Plaintiff's rights under §

8-107 of the New York City Human Rights Law by discriminating against them on the basis of

their gender, color, and race. Plaintiffs were singled out and treated differently from their other

male and Caucasian employees, co-workers, and colleagues in the department where they

sexually harassed and humiliated, lost promotion opportunities, lost potential raises and

opportunities to receive raises, were retaliated against, issued unrealistic and unattainable

deliverables, received sham "write ups" and other criticisms and mistreatment, and in the case of

Ms. Curtis, lost employment.

## AND AS FOR A FOURTH CAUSE OF ACTION

66.     Defendants, individually and aiding each other, violated Plaintiffs' rights under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* by retaliating against them

because they complained about discriminatory treatment, including but not limited to sexual

harassment by their respective supervisors and co-workers.

## AND AS FOR A FIFTH CAUSE OF ACTION

67.     Defendants, individually and aiding each other, violated Plaintiffs' rights under §

296 of the New York State Human Rights Law by retaliating against them because they

complained about discriminatory treatment, including but not limited to sexual harassment by

their respective supervisors and co-workers.

## AND AS FOR A SIXTH CAUSE OF ACTION

68.     Defendants, individually and aiding each other, violated Plaintiffs' rights under §

8-107 of the New York City Human Rights Law by retaliating against them because they

complained about discriminatory treatment, including but not limited to sexual harassment by their respective supervisors and co-workers.

## DAMAGES

69.     As a direct result of Defendants' individual and/or concerted discriminatory actions and omissions against Plaintiff Denise Curtis, she suffered the ultimate adverse employment action, termination, and suffered a loss of pay and attendant employment benefits.

70.     As a direct and proximate result of Defendants' individual and/or concerted discriminatory actions and omissions, Plaintiffs suffered severe emotional distress, with consequential physical illnesses.

71.     As a direct and proximate result of Defendants' individual and/or concerted discriminatory actions and omissions, Plaintiffs' respective reputations were severely harmed causing personal injury.

72.     As a direct and proximate result of Defendants' individual and/or concerted discriminatory actions and omissions Plaintiffs' reputation was severely harmed and their ability to advance their respective careers has been severely undercut, causing them each great hardship.

73.     In acting as they did, Defendants acted maliciously and recklessly, entitling Plaintiffs each to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray that judgment be entered:

1.     Declare and adjudge that Defendant ConEd's employment policies, practices and/or procedures challenged herein are illegal and in violation of the Plaintiffs' rights under Title VII, 42 U.S.C. § 1981, the New York Executive Law, and the New York Administrative Law;

2.      Issue a permanent injunction against the Defendants and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiffs and order such injunctive relief as will prevent Defendants from continuing their discriminatory practices and protect others similarly situated;

3.      Issue a permanent injunction against the Defendants and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs usages, or gender, race, color or ethnicity discrimination as set forth herein;

4.      Enter judgment ordering Defendants to initiate and implement programs that will: (a) provide equal employment opportunities for all women, including women of color, (b) remedy the effect of ConEd's past and present unlawful employment policies, and (c) eliminate the continuing effects of the discriminatory practices described above;

5.      Enter judgment ordering ConEd to establish a task force on equality and fairness to determine the effectiveness of the programs described in 72 above, which would provide for (a) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunities, (b) the assurance that injunctive relief is properly implemented, and (c) a quarterly report setting forth information relevant to the determination of the effectiveness of the program described in 72 above;

6.      Retain jurisdiction of the action until such time as the Court is satisfied that Defendants have remedied the practices complained of herein and is determined to be in full compliance with the law;

7.      Enter judgment awarding Plaintiffs each their respective emotional distress damages in the sum of $5,000,000.

8.      Enter judgment awarding Plaintiffs punitive damages in the sum of $10,000,000.

9.      Enter judgment awarding nominal, compensatory, and punitive damages to

Plaintiffs;

10.     Enter judgment ordering Defendants to make whole Plaintiffs by providing them

with appropriate lost earnings and benefits, and other affirmative relief;

11.     Award litigation costs and expenses, including, but not limited to reasonable

attorneys' fees, to Plaintiffs;

12.     Grant Plaintiffs such other and further relief as the Court deems proper and just.

### **JURY DEMAND**

Plaintiffs hereby demand a jury trial.


Dated: New York, New York
November 17, 2015


                                        ADVOCATES FOR JUSTICE
                                        CHARTERED ATTORNEYS
                                        Attorneys for Plaintiffs


                                        By:_____/s/_____
                                        Arthur Z. Schwartz (AZS 2683)
                                              225 Broadway, Suite 1902
                                              New York, New York 10007
                                              (212) 285-1400
                                              aschwartz@afjlaw.com